IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No.: 5:04-CV-215-BR(3)

FILED MAR 29 2004

MARY JUDE DARROW,

    Plaintiff,

v.

JOHN D. ASHCROFT,
U.S. ATTORNEY GENERAL

    Defendant.

COMPLAINT
(Jury Trial Demanded)

## NATURE OF THE ACTION

This is an action under Title VII of the Civil Rights Act of 1964, Title I of the Civil Rights Act of 1991, and Sections 501 and 504 of the Rehabilitation Act, to correct unlawful employment practices on the basis of race, gender, retaliation and perceived disability, and to provide appropriate relief to Mary Jude Darrow who was adversely affected by such practices.

## JURISDICTION AND VENUE

1. Jurisdiction is conferred on this Court by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-5(f) and 2000e-16(c); the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794, Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981A, and 28 U.S.C. §§ 1331 and 1343.

2. Venue is properly laid under 28 U.S.C. § 1391 in that the employment practices alleged to be unlawful were committed in Wake County, North Carolina, within the jurisdiction of the United States District Court for the Eastern District of North Carolina, Western

Division.

3. On or about March 10, 2003, Plaintiff filed an EEO Complaint on the basis of gender, race, retaliation and perceived disability against the Defendant.

4. The EEO Complaint was timely filed with respect to all issues alleged.

5. This action is initiated more than 180 days after the filing of Plaintiff's EEO Complaint with no final decision having been issued nor any voluntary resolution achieved.

6. Pursuant to 42 U.S.C. § 2000e-16(c) and 29 C.F.R. § 1614.407(b), all jurisdictional prerequisites to the filing of this suit have been satisfied.

## PARTIES

7. Plaintiff, Mary Jude Darrow, is an adult citizen and resident of Wake County, North Carolina. She is a Caucasian female who was at all times material to this action a qualified handicapped person within the meaning of Section 501 of the Rehabilitation Act. At all times material to this action, Ms. Darrow was and is an Assistant United States Attorney in the United States Attorney's Office for the Eastern District of North Carolina.

8. Defendant John D. Ashcroft, Attorney General of the United States, is the head of the Department of Justice, an agency of the Unites States of America. The United States Attorney's Office for the Eastern District of North Carolina functions under the direction and control of the Attorney General of the United States.

9. At all times material to this action, the United States Attorney for the Eastern District of North Carolina has been Frank Whitney; the First Assistant United States Attorney has been George Holding; the Chief of the Criminal Division has been successively John

2

Bruce and Robert J. Higdon, Jr.; and the Deputy Criminal Chief and Plaintiff's direct supervisor has been Eric Evenson (collectively "Plaintiff's supervisors").

## FACTS GIVING RISE TO THE PLAINTIFF'S CAUSE OF ACTION

10. Plaintiff is an attorney who, since 1985, has been licensed to practice law by the state of Louisiana.

11. In 1990, after four years as an Assistant District Attorney for the Orleans Parish (Louisiana) District Attorney's Office, Plaintiff was hired as an Assistant United States Attorney ("AUSA") for the Eastern District of Louisiana. In this office, Plaintiff served with the Bank Fraud Unit, the Organized Crime Drug Enforcement Task Force, and the Violent Crime Unit.

12. From 1995 to 1997, Plaintiff was selected for a detail to the Executive Office for United States Attorneys at the Department of Justice in Washington, D.C., where she coordinated criminal continuing education courses for AUSAs and Department of Justice Attorneys.

13. In 1999, Plaintiff transferred to the United States Attorney's Office for the Eastern District of North Carolina where she was assigned to the Organized Crime Drug Enforcement Task Force ("narcotics unit").

14. Upon information and belief, during 2002, Plaintiff carried one of the highest case loads of any of the eight AUSAs assigned to the narcotics unit. In May of 2002, Plaintiff advised her supervisors that her caseload was too high and that she was concerned about her ability to handle so many cases. The response of her supervisors was to assign additional cases.

15. In the summer of 2002, Plaintiff was advised by an African-American AUSA assigned to

3

the narcotics unit that the supervisor of the unit had attempted to assign additional cases to her, but that she refused out of concern for the effect it might have on her evaluation. The African-American AUSA suffered no consequences from her refusal to accept additional cases. At the time of this conversation, Plaintiff was assigned nearly 100 open cases, while the African-American AUSA was assigned only 45.

16. As a result of the overload of case assignments, in the Spring of 2002 Plaintiff missed two speedy trial deadlines. For each deadline she missed, Plaintiff was issued a reprimand. In addition, Plaintiff's supervisors reported her to the Office of Professional Responsibility ("OPR") of the Department of Justice for investigation.

17. In or about July or August of 2002 a male AUSA, with a substantially smaller caseload than Plaintiff, missed a speedy trial deadline. He was not issued a reprimand and he was not reported to OPR for investigation.

18. In July of 2002, Plaintiff was assigned a major fraud case to handle only two months prior to trial. Initially, Plaintiff was assigned to assist a male AUSA with the case, but was subsequently given sole primary responsibility. Plaintiff requested the assignment of a second attorney to assist her as she had been assigned to assist the male AUSA. She also requested secretarial assistance for trial preparation and the trial itself, as well as an accounting analyst. All of her requests for assistance were denied. Plaintiff's supervisors continued to assign additional cases to her.

19. In contrast to Plaintiff's treatment, a male African-American AUSA in the narcotics unit was assigned a major case which was originally scheduled to go to trial in November of 2001. During his preparation for the case, his caseload was re-assigned. The case did not

4

actually go to trial until the Spring of 2002, but his caseload remained reassigned during the entire time he handled the case. This male African-American co-worker was given the assistance of a second attorney and a secretary during the trial itself.

20. In August of 2002, a male AUSA in the General Crimes Unit was also assigned a major fraud case shortly before indictment. In contrast to the treatment of Plaintiff, he has been assigned two additional attorneys to assist him In addition he has been given the additional assistance of an accounting analyst, a victim-witness coordinator, a secretary and office law clerks. In addition, case assignments to the male co-worker ceased while he handles the fraud case.

21. The same male AUSA referred to in the previous paragraph had a major fraud case similar to the Plaintiff's, which he had handled since the onset of the investigation. That case was tried in February, 2003. During that trial, the male AUSA was given the assistance of another attorney, an accounting analyst, a victim-witness coordinator, and a secretary.

22. In October of 2002, Plaintiff again advised her supervisors that her workload was excessive. Within a week she was assigned two additional cases, one of which was a homicide case which required considerable immediate attention.

23. The Plaintiff's major fraud case went to trial on November 5, 2002 after the defense had obtained a two month continuance. The trial lasted for nearly three weeks after which the jury returned verdicts of guilty against both defendants on all charges. At the time of indictment, the then Criminal Chief expressed his doubts that the case could be won.

24. During the trial, Plaintiff requested assistance from her supervisors in covering other

5

cases to which she was assigned, some of which required actions she could not perform because of her absence at trial. Plaintiff was advised by Evenson, her immediate supervisor, that it was her responsibility to see that all of her cases were covered. When Plaintiff took the matter up with Higdon, the Criminal Chief, he reiterated that it was her responsibility to obtain coverage for all cases assigned to her. She then advised Higdon that it was her intention to file an EEO complaint due to her supervisors' unwillingness to support her trial efforts. Higdon advised Plaintiff not to threaten him.

25. On November 26, 2002, Plaintiff initiated informal EEO proceedings.

26. As a consequence of the stress of handling the major fraud case with no support, as well attempting to maintain coverage of all other cases to which she was assigned, Plaintiff took sick leave at the conclusion of the fraud trial. While on leave, Plaintiff consulted with a psychiatrist who provided her with a note placing her on leave for medical reasons. The doctor's note was presented to Plaintiff's supervisor at the outset of her medical leave period. She remained on medical leave from November 29, 2002 until December 16, 2002.

27. On December 13, 2002, Plaintiff's doctor authorized Plaintiff's return to work, without restriction, on December 16, 2002. A note from Plaintiff's doctor to this effect was submitted to Plaintiff's supervisors.

28. On December 14, 2002, Plaintiff received a demand from her supervisors that she submit an extensive amount of medical information justifying her medical leave.

29. Upon her return to work on December 16, 2003, notwithstanding that she had presented her supervisors with the note from her doctor releasing her to return to work without

6

restriction, Plaintiff was informed that until she had undergone the medical evaluation, she was not allowed to appear in court or sign court-related documents. Criminal Chief Higdon, indicated that the restrictions on her job performance were based on the fact that she had consulted with a psychiatrist. In addition, she was informed that until the medical evaluation was received, her absence would not be authorized as sick leave, thereby jeopardizing her pay status.

30. Also on December 16, 2002, Plaintiff received a memorandum from Criminal Chief Higdon ordering her to contact the Employee Assistance Program. Higdon closed his letter by noting that he would be observing her performance and would re-evaluate it in 30 days. He further noted that whether or not she contacted EAP would be important to his reevaluation.

31. Plaintiff's supervisors provided no alternative means for Plaintiff to carry out her responsibilities during the period she was prohibited from appearing in court or signing court-related documents. As a result, Plaintiff was required to personally solicit the assistance of co-workers to sign pleadings and make court appearances. As such, her rights to privacy and confidentiality regarding her medical condition and the restrictions placed on her by her supervisors was denied.

32. In contrast to Plaintiff's treatment, in June of 1999, a male AUSA withdrew from a complex trial on the first day of the trial and took two weeks of sick leave. No demand for medical evaluation was made of him, and upon his return to work, no restrictions were placed on his ability to make court appearances or sign court-related documents.

33. On January 7, 2003, Plaintiff's doctor provided Plaintiff's supervisors with additional

7

medical information regarding her leave. Since that date, Plaintiff has been required to submit all pleadings to her supervisor for approval and signature. No other attorney in the office is required to do so.

34. On January 13, 2003, the Criminal Chief responded to a letter from a defense attorney who had written concerning his efforts to contact Plaintiff regarding a case they were both involved in. The Criminal Chief apologized for Plaintiff's lack of contact and informed the defense attorney that Plaintiff had handled the matter unprofessionally.

35. On January 27, 2003, Plaintiff's supervisors conducted a review of her cases and upon conclusion of the review informed Plaintiff that she could resume making court appearances and signing court-related documents. At this time, Plaintiff was informed of a number of restrictions and controls on the performance of her job duties. No other attorney working for Defendant in the Eastern District of North Carolina had such restrictions and controls placed on job performance.

36. On February 11, 2003, a mediation was held with respect to her informal EEO complaint. The mediation was unsuccessful in resolving the issues raised in the complaint.

37. On March 10, 2003, Plaintiff filed a formal EEO complaint. On that same date, she was called to a meeting with her supervisors to address issues left unresolved by the mediation. Plaintiff was informed that her work was unsatisfactory and that she was facing suspension and possible termination.

38. In April of 2003, Plaintiff was handling a murder case involving narcotics. On April 11, 2003, an Order from the Magistrate Judge was received in the office. The Order required a response to a motion to suppress evidence by 5:00 p.m. on April 14, 2003. The Order

8

was not conveyed to Plaintiff even though she was present in the office up to and including the deadline imposed for filing the response. As a result, Plaintiff was not able to file the response when ordered.

39. In June of 2003, Plaintiff's superiors made a number of additional allegations of professional misconduct to OPR regarding criminal cases being handled by Plaintiff.

40. During the remainder of 2003, Plaintiff's supervisors refused to assign Plaintiff a work load commensurate with her prior performance levels, as well as commensurate with other AUSAs in the office. Plaintiff repeatedly requested additional work.

41. On February 23, 2004, OPR submitted a 117 page report concerning its investigation of all matters to which it had been referred by Plaintiff's supervisors regarding her handling of various cases to which she was assigned. The report concluded that Plaintiff engaged in nine instances of intentional professional misconduct, five instances of professional misconduct, and exercised poor judgment on two occasions. OPR found that on two of the instances referred by her supervisors, Plaintiff did not engage in professional misconduct or exercise poor judgment.

42. On February 24, 2004, Plaintiff was placed on a 90 day performance improvement plan.

43. On March 9, 2004, Plaintiff received notice that the United State Attorney intended to terminate her employment. During a period of appeal, Plaintiff was removed from the office and assigned to work from her home.

9

# FIRST CAUSE OF ACTION

## Discrimination in Employment on the Basis of Gender and Race

## Civil Rights Acts of 1964 and 1991

44. Plaintiff repeats and realleges by reference each and every allegation contained in paragraphs 1 through 43 and incorporates the same herein as though fully set forth.

45. Defendant, through his agents and supervisors has engaged in a pattern and practice of unlawful discrimination against Plaintiff on the basis of her gender and race in violation of Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991.

46. As herein alleged, Defendant, through his agents and supervisors has subjected Plaintiff to less favorable treatment in the terms and conditions of her employment than similarly situated male and African-American AUSAs.

47. The above-described disparate treatment created an intimidating, oppressive, hostile and offensive work environment which interfered with Plaintiff's emotional well-being.

48. As a direct and proximate result of Defendant's willful, knowing and intentional discrimination against her, Plaintiff has suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress; she has incurred and will continue to incur medical expenses for treatment by a psychiatrist and other health professionals, and for other incidental expenses; and she has suffered and will continue to suffer loss of earnings and other employment benefits and job opportunities. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proved at trial.

49. As a further and direct and proximate result of Defendant's violation of Title VII, as

10

heretofore described, Plaintiff has been compelled to retain the services of counsel in an effort to enforce the terms and conditions of the employment relationship with Defendant, and has thereby incurred, and will continue to incur, legal fees and costs in amount to be documented to the Court when fully ascertained. Plaintiff requests that attorneys fees be awarded.

## SECOND CAUSE OF ACTION

### Employment Discrimination on the Basis of Disability

### Sections 501 and 504 of the Rehabilitation Act

50. Plaintiff repeats and realleges by reference each and every allegation contained in paragraphs 1 through 49 and incorporates the same herein as though fully set forth.

51. As herein alleged, Defendant, through his agents and supervisors, has engaged in a pattern and practice of unlawful discrimination against Plaintiff on the basis of their unwarranted and unlawful perception that she was substantially limited by her medical condition in her ability to perform the essential functions of her assigned position, in violation of the Rehabilitation Act of 1973.

52. As herein alleged, Defendant, through his agents and supervisors, has violated the Rehabilitation Act of 1973 by demanding and requiring extensive medical information from Plaintiff to which Defendant was not entitled.

53. As herein alleged, Defendant, through his agents and supervisors, has violated the Rehabilitation Act of 1973 by limiting and restricting Plaintiff in the performance of her duties until such time as she turned over to Defendant extensive medical information to which Defendant was not entitled.

11

54. As herein alleged, Defendant, through his agents and supervisors, has violated the Rehabilitation Act of 1973 by ordering Plaintiff to seek the services of the Employee Assistance Program and conditioning her performance evaluations on acceding to this demand.

55. As herein alleged, Defendant, through his agents and supervisors, has violated the Rehabilitation Act of 1973 by requiring Plaintiff to seek the assistance of co-workers in order to carry out Defendant's limitations and restrictions on her ability to perform the duties of her position without providing any method for doing so without revealing confidential medical information and/or the unlawful perception of her supervisors that Plaintiff was substantially limited by her medical condition in her ability to perform the essential functions of her position.

56. As a direct and proximate result of Defendant's willful, knowing and intentional discrimination against her, Plaintiff has suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress; she has incurred and will continue to incur medical expenses for treatment by a psychiatrist and other health professionals, and for other incidental expenses; and she has suffered and will continue to suffer loss of earnings and other employment benefits and job opportunities. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proved at trial.

57. As a further and direct and proximate result of Defendant's violation of the Rehabilitation Act of 1973, as heretofore described, Plaintiff has been compelled to retain the services of counsel in an effort to enforce the terms and conditions of the employment relationship

12

with Defendant, and has thereby incurred, and will continue to incur, legal fees and costs in amount to be documented to the Court when fully ascertained. Plaintiff requests that attorneys fees be awarded.

### THIRD CAUSE OF ACTION

#### Retaliation

#### Civil Rights Act of 1964 and Rehabilitation Act of 1973

58. Plaintiff repeats and realleges by reference each and every allegation contained in paragraphs 1 through 57 and incorporates the same herein as though fully set forth.

59. As herein alleged, Defendant, through his agents and supervisors, illegally retaliated against Plaintiff by subjecting Plaintiff to unequal terms and conditions of employment, unjust discipline, suspension, making unwarranted referrals to OPR and notification of termination solely because Plaintiff notified her supervisors of her intention and later filed an EEO complaint alleging gender and race discrimination, perception of disability, and retaliation. Defendants had no legitimate business reasons for any of such acts. Each of said acts of retaliation are in violation of Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973.

60. As a direct and proximate result of Defendant's willful, knowing and intentional discrimination against her, Plaintiff has suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress; she has incurred and will continue to incur medical expenses for treatment by psychotherapists and other health professionals, and for other incidental expenses; and she has suffered and will continue to suffer loss of earnings and other employment benefits and job opportunities.

13

Plaintiff is thereby entitled to general and compensatory damages in amounts to be proved at trial.

61. As a further and direct and proximate result of Defendant's violation of Title VII and the Rehabilitation Act, as heretofore described, Plaintiff has been compelled to retain the services of counsel in an effort to enforce the terms and conditions of the employment relationship with Defendant, and has thereby incurred, and will continue to incur, legal fees and costs in amount to be documented to the Court when fully ascertained. Plaintiff requests that attorneys fees be awarded.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that judgment be entered in her favor and against Defendant as follows:

A. Plaintiff be awarded general and compensatory damages, including prejudgment interest, in an amount according to proof at trial;

B. Plaintiff be awarded reasonable attorneys' fees and costs of suit;

C. Plaintiff be reinstated to her position with full restoration of benefits;

D. Defendant be enjoined from taking personnel actions, evaluating employee's performance, placing employees on performance improvement plans, suspending and separating employees from employment and otherwise taking adverse employment actions against employees because of their race and gender, perceived disability, and the exercise of protected activities; and

E. Plaintiff be awarded such other and further relief as the Court deems just and proper.

14

Respectfully submitted this the 29 TH day of March, 2004.

           MEYER & MEUSER, P.A.

BY: _____
           Deborah N. Meyer, Esq.
           North Carolina Bar No.: 19186
           John B. Meuser
           North Carolina Bar No. 8415
           4030 Wake Forest Road
           Suite 101
           Raleigh, North Carolina 27609
           Telephone (919) 877-9233
           Fax: (919) 877-9984